Christine Anderson Ferraris, #031414
Stephen Weeks, #020726
A. FERRARIS LAW, P.L.L.C.
333 N. Wilmot, Suite 340
Tucson, AZ 85711
Tel.:(520) 282-4201
Email: cferraris@aferrarislaw.com
Email: sweeks@aferrarislaw.com
*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bonnie Creech,<br><br>    Plaintiff,<br><br>v.<br><br>Barrett Financial Group, L.L.C.; Broker Solutions, Inc., dba Kind Lending, Kind Lending, L.L.C.; John Claude Hegglin, an individual, and as an agent of Barrett Financial Group, L.L.C., Broker Solutions, Inc., dba Kind Lending; and Kind Lending, L.L.C.; and Jane and John Doe employees 1-10.<br><br>    Defendants. | Case No.:<br><br><br>**CIVIL COMPLAINT DEMAND FOR JURY TRIAL** |

Plaintiff, Bonnie Creech submits this complaint against Defendants for conduct that caused Ms. Creech and her parents to incur harm by their unfair and deceptive lender practices subjecting Defendants to state and federal legal claims as described in the following complaint.

**I.     PARTIES, JURISDICTION AND VENUE**

1. Plaintiff, Bonnie Creech ("Ms. Creech" or "Plaintiff"), resides in Bluemont, Virginia

1

and entered into a loan to purchase a manufactured home in Kingman, Arizona a residence she purchased for her elderly parents.

2. Barrett Financial Group, L.L.C. ("Barrett" or "Defendant"), is identified as the lender in loan status documents provided to Ms. Creech in March 2021 and April 2021 shortly prior to closing. Barrett operates its principal place of business from Gilbert, Arizona in Maricopa County. Barrett is a registered Arizona limited liability company. In a Revised Loan Estimate dated May 13, 2022, Barrett is identified as the mortgage broker. In the Promissory note, Barrett is identified as the loan originator organization.

3. Defendant John Claude Hegglin ("Hegglin") represented with loan documents that he acted as loan officer for Barrett. Hegglin is identified as Barrett's loan officer in loan status documents provided to Ms. Creech in March 2021 and April 2021. The email address he used during the loan transaction as the loan officer was john@Barrettfinancial.com, and his email signature consists of the following: NMLS : 1054250 Arizona: 0927835, Michigan:1054250, Utah 120405991. Mortgage Loan Originator, 2314 South Val Vista Dr #201 Gilbert AZ. 85295 Office :480-459-4500 Mobile :480-535-4620 Fax:480-718-8999. Hegglin also represented during the loan transaction he acted for Broker Solutions, Inc. dba Kind Lending. Hegglin is listed on the Promissory note as individual loan originator.

4. Broker Solutions, Inc. is a California corporation, registered in Arizona as a foreign corporation since 2005. Its Affidavit of Publication dated August 18, 2005, states that it adopted the fictitious name New American Funding, Inc. (FN) when registering its business in Arizona. Broker Solutions, Inc.'s annual reports file with the Arizona

2

Corporation Commission for 2022 and 2021 represent its character of business is mortgage lending, with a Phoenix address of 8825 N. 23rd Ave., Suite 100, Phoenix, Arizona, 85021. President is Enrico Arvielo in Las Vegas, and President is Patricia Arvielo in Las Vegas. A changed Circumstance Letter and Loan Estimate dated May 13, 2021, identify Broker Solutions, Inc., dba Kind Lending as the lender as do the Closing Disclosure dated May 19, 2021. The email to Ms. Creech from Kind Lending has both records attached states questions about loan documents are to be addressed to John Hegglin and Barrett Financial Group, L.L.C. Broker Solutions, Inc. dba Kind Lending is listed as the lender on the Promissory note.

5.  Kind Lending, LLC is a Kentucky limited liability company, its manager is Kind Holdings, LLC. Kind Lending, LLC adopted the fictitious name: Kind Loans (FN) when registering with entity with the Arizona Corporation Commission. The Articles of Organization filed with the Arizona Corporation Commission on January 28, 2021 indicate that Kind Lending, LLC is in the mortgage lending services business. Its principal office according to Statement of Change of Principal Office Address, filed Feb. 2, 2021, is Hutton Centre Dr., Suite 1000, Santa Ana, CA 92707. The appraisal report for the manufactured home purchased identified "Kind Lending" as the lender for the transaction at issue.

6.  Together, Barrett, Broker Solutions, Inc. and Kind Lending, are referenced hereinafter by their name or together as the lender/loan originator with Hegglin acting as their respective agent.

7. John and Jane Doe employees are lender/loan originators employees that have yet to be identified and disclosed but who acted on behalf of the lender/loan originators relative to the claim under the Truth in Lending Act.

8. Venue is proper in this Court pursuant to A.R.S.§§ 12-401 to 12-401 in that Defendants conduct regular business within Maricopa County and most of the events, actions related to the manufactured home purchase, its loan and origination occurred in or from Maricopa County.

## II.   GENERAL ALLEGATIONS

9. In or around January 2021, Ms. Creech applied for a loan with Barrett loan officer Mr. Hegglin to purchase a manufactured home for her elderly parents.

10. In or around February 5, 2021, after Ms. Creech submitted a loan application, she received a loan pre-qualification letter.

11. Ms. Creech told Mr. Hegglin that she was unfamiliar with the purchase and lending requirements for manufactured homes.

12. Living in Virginia, Ms. Creech relied on Mr. Hegglin to help her obtain a loan to purchase an Arizona property because her parents needed a place to live and would soon be without a home.

13. In or around March 2021, Ms. Creech flew to Arizona from Virginia to view a home in Kingman, Arizona (the "Kingman home") to ensure it fit the needs of her elderly parents, who have significant health and mobility issues.

14. Shortly thereafter, Ms. Creech made an offer on the Kingman home and the offer was promptly accepted.

4

15. Ms. Creech requested and was told an appraisal of the home would be scheduled promptly because she had already been pre-approved for the loan.

16. Ms. Creech did not receive the appraisal until May 10th, though the Appraisal report is dated April 16, 2021. According to the email records "Kind Lending" provided the appraisal report on May 10, 2021.

17. The sellers had informed Ms. Creech they could not wait any longer for her to purchase the Kingman home late April and early May. Hegglin did not provide Ms. Creech with the appraisal for nearly a month.

18. Ms. Creech was losing sleep and suffered stress and anxiety while waiting for the delayed appraisal report and feared she would lose the opportunity to purchase the Kingman home for her elderly parents.

19. Mr. Hegglin reassured Ms. Creech that he was doing all that he could to promptly complete the loan process.

20. On May 11, 2021, upon receipt of the appraisal, Ms. Creech and the sellers agreed to a decrease in the purchase price, given the decreased valuation of the appraisal report.

21. On May 13, 2021, Mr. Hegglin provided Ms. Creech with a Changed Circumstances Letter and revised Loan Estimate Statement defining a "change in circumstances" as a change in "sales price", "value" or "loan amount" and a mandated rate lock extension.

22. The Loan Estimate Statement had a loan amount of $142,500, and an origination charge of .61 percent of the loan amount, which amounted to $869.

23. On May 14, 2021, Mr. Hegglin sent the Closing Disclosure Statement with an

5

increased origination charge of .77 percent of the loan amount, or $1,097.25, increasing the origination charge by $288.25..

24. Also included in the Closing Disclosure Statement was a charge for $672.75 for an Architectural and Engineering Fee that Ms. Creech had already paid to AZ Sunwest Construction on May 11, 2021.

25.     Ms. Creech informed Mr. Hegglin that she had already paid the Architectural and Engineering Fee and that she had emailed him a copy of the receipt on May 12, 2021.  She offered to provide him again, for the second time, the receipt for the Architectural and Engineering Fee in the amount of $672.75.

26. Mr. Hegglin assured Ms. Creech that the fee would be removed from the final Closing Statement.

27. On May 20, 2021, the initial closing date, Ms. Creech was provided with the revised final Closing Disclosure Statement.

28. This record showed another increased monthly mortgage insurance fee of $81.94 (a monthly increase of $19 from the Closing Disclosure Statement dated May 14th) and increased origination fee of 1.27% of the loan amount, which amounted to $1,809.75.

29. This increase of the total origination fee was $712.50 more than the first Closing Disclosure Statement dated May 14th.

30. The $672.75 Architectural and Engineering Fee remained on the closing statement.

31. On May 20th, Ms. Creech called Mr. Hegglin during closing to ask why the lender fees had increased without notice and why she continued to be charged for the

Engineering Fee that had already been paid, and why she had not been notified of the increased charges before closing.

32. Mr. Hegglin dismissed Ms. Creech's concerns and advised her to move forward with signing the closing documents, promising her again that the $672.75 charge for Architectural and Engineering Fees would be refunded. It was never refunded and remains part of the loan.

33. During the May 20th closing, when Ms. Creech called Mr. Hegglin to ask about changes and errors on the Closing Disclosure Statement, Mr. Hegglin disclosed for the first time (after he had already sent the May 14th Disclosure Statement), that the appraiser informed him a Manufactured Home ("MH") Advantage sticker was not found during the appraisal inspection, so Mr. Hegglin switched to a different loan product, resulting in the higher fees and an Annual Percentage Rate increase. Ms. Creech relied on this representation being true and moved forward with the loan process.

34. Mr. Hegglin never informed Ms. Creech prior to closing that the home required an MH Advantage sticker and, without it she was ineligible for the loan terms she relied upon and she had qualified for under the loan estimate provided.

35. Though she requested, Ms. Creech was never informed how the MH Advantage sticker purportedly triggered a mandated change in the loan product.

36. The revised Closing Disclosure Statement dated May 25, 2021 shows that the Lender and Mr. Hegglin failed to provide an accurate closing statement and included charges that Barrett and Hegglin were informed should not be on the closing statement.

37. Mr. Hegglin was never clear as to his role in the loan process.

38. Mr. Hegglin owed a duty to Ms. Creech to be forthcoming and disclose information about the loan such as the change in loan product and increased costs.

39. The change in the loan product and increased fees were never disclosed to Ms. Creech. Ms. Creech relied upon Mr. Hegglin to provide timely notice of changes and moved forward with the loan process not knowing Mr. Hegglin had failed to provide loan information, such as the appraisal report, to Ms. Creech's detriment.

40. Given her parents needs for a home and having to stay in a motel, combined with their fears and health concerns amidst the COVID 19 pandemic, Ms. Creech relieve upon Mr. Hegglin's representations and ultimately believed she had no choice but to sign the closing documents with each closing rather than cancel the sale and start over.

41. Ms. Creech had relied upon Mr. Hegglin's representations and as a result had unexpected and higher costs and had to pay again fees she had paid for, and accept more onerous payment terms than Mr. Hegglin had represented to Ms. Creech prior to closing.

42. On or about May 24, 2021, Ms. Creech asked Mr. Hegglin about the Truth in Lending Act's restrictions on increases in lender fees and inquired if she should have received notice of the change in loan terms prior to the closing.

43. Mr. Hegglin responded he had met all legal obligations and had provided proper disclosures.

44. Though Ms. Creech had signed the closing documents on May 20, 2021, by May 25, 2021, the loan remained unfunded.

45. Ms. Creech was sleeping poorly and suffered stress, anxiety, and loss of appetite, given that the loan was not timely funded and her parents had to move to a hotel while

waiting for the sale to conclude. Her parents, who suffer from a variety of health conditions, including high blood pressure, limited mobility, and chronic obstructive pulmonary disease, also experienced sleeplessness, poor appetite, stress, and anxiety, and were extremely fearful of staying in a hotel and contracting COVID-19, given their preexisting health conditions and high-risk status. Ms. Creech's parents also suffered food poisoning while staying in the hotel due to the delayed loan closing.

46. Ms. Creech informed Mr. Hegglin about her anxiety because her parents were homeless and relied upon the representation that the loan process would be promptly completed and of her health concerns of her parent's wellbeing and her parent given they were without a home and relying on waiting for the purchase of the Kingman home.

47. On May 25, 2021, Mr. Hegglin, for the first time, claimed that a three-day waiting period was required due to the APR increase on the May 20, 2021, Disclosure Statement.

48. Mr. Hegglin without notice or communicating beforehand with Ms. Creech, unilaterally canceled the May 20, 2021, closing where all documents had been signed and Ms. Creech understood was finalized. without notice, re- scheduled the closing date to May 26th.

49. Mr. Hegglin did so after being informed by Ms. Creech of her rights and his failures to meet federal law obligations.

50. Because of the cancellation Ms. Creech was forced to pay more to extend her elderly parents' hotel stay ($956.35) and to extend their moving truck rental period ($2,085).

51. Ms. Creech asked Mr. Hegglin to honor the original terms represented in the May

9

14, 2021, Closing Disclosure Statement to help pay for these increased an unanticipated expenses.

52. Mr. Hegglin promised to provide credit to offset the loss but, in the end, again reneged on his promise to reimburse her for the extra expenses incurred instead on May 26, 2021, Ms. Creech was presented with a third Closing Disclosure Statement. The lender credit Mr. Hegglin promised was limited to $450, a minimal amount given the economic loss, aggravation, and stress that Mr. Hegglin's conduct had caused Ms. Creech and her parents.

53. By this time, Ms. Creech and her parents were under significant additional stress because the sellers threatened to cancel the sale due to delays. This stress, combined with Mr. Hegglin's revoked offer to fully credit the total loss incurred or honor the initial loan terms, caused Ms. Creech and her parents significant worry and anxiety. With each day of delay, Ms. Creech was paying $150 to shelter her parents in a motel and her high-risk parents were under significant risk of contracting COVID-19.

54. Ms. Creech sought an alternative and wanted to cancel the transaction however decided she couldn't for it would take, at minimum, another 60 days to seek financing elsewhere, to restart the loan process with another lender, and complete the purchase.

55. If she had cancelled Ms. Creech likely would have had to find a new house suitable for her elderly parents and likely struggled to do so, given the very competitive real estate market.

56. In the face of these mounting pressures of costs, delays, and stress, Ms. Creech

10

signed the closing documents on May 26th.

57. Early June 2021, Ms. Creech received a Final Master Statement from Chicago Title Agency, Inc. detailing the final closing accounting calculations.

58. The Engineering Fee, contrary to Mr. Hegglin's promise, was not refunded, and Ms. Creech was charged a second $250 mobile notary fee for the rescheduled closing though Mr. Hegglin promised it would not be charged.

### III. LEGAL CLAIMS

**CLAIM ONE: VIOLATION OF THE TRUTH IN LENDING ACT:
FAILURE TO TIMELY DISCLOSE LOAN TERMS
(Defendants Lender/Originator: Barrett, Broker Solutions, Inc. and Kind Lending)**

59. All prior allegations are incorporated by reference.

60. Lender/Loan Originator Barrett, Broker Solutions, Inc. and Kind Lending through its loan officer Hegglin violated the Truth in Lending Act Regulation Z by failing to timely disclose the increased costs of the loan prior to closing.

61. Lender/Loan Originator Barrett, Broker Solutions, Inc. and Kind Lending through its loan officer Hegglin failed in their respective duty of care requirement for mortgage originators as implemented by Regulation Z under 15 U.S.C. 1639(b)(1)(A).

62. Further under, 12 C.F.R. § 1026.17(f), which mandates early disclosures shall be provided before consummation of the loan (subject to the provisions of §1026.19(a)(2), (e), and (f)):

   **(1)** Any changed term unless the term was based on an estimate in accordance with §1026.17(c)(2) and was labeled an estimate;

   **(2)** All changed terms, if the annual percentage rate at the time of consummation varies from the annual percentage rate disclosed earlier by

11

more than $1/8$ of 1 percentage point in a regular transaction, or more than $1/4$ of 1 percentage point in an irregular transaction, as defined in §1026.22(a).

63. See *DeMando v. Morris* 206 F.3d 1300, 1303 (9th Cir. 2000)(DeMando pursued claim when the Notice of Change in Terms violated TILA). Notably, TILA is a **strict liability statute**. *Balderas v. Countrywide Bank*, 664 F.3d 787, 791 (9th Cir. 2011) (reiterating an earlier decision that even a technical or minor TILA violations impose liability, such as a misstatement of rescission deadline by one day will extend a consumer's right to rescission period). *See also Abubo v. Bank of N.Y. Mellon*, 977 F. Supp. 2d 1037, 1044 (D. Haw. 2013) (To ensure a consumer is protected TILA and accompanying regulations "must be absolutely complied with and strictly enforced)."

64. Ms. Creech incurred economic loss by being charged and increase in APR and mortgage insurance; twice for the architect fee of $672.75; additional costs to place parents in hotel of $956.35; rental truck fees $2,085.00, and charged twice for $250.00 mobile due to Hegglin's conduct. Barrett and Hegglin's conduct caused Ms. Creech to lose her appetite, anxiety and worry because of the deterioration of her parents' health and other related fears for them having to stay in a motel much longer than they should have.

65. Based on Lender/Loan Originator Barrett, Broker Solutions, Inc. and Kind Lending' conduct during the loan application process, each Lender/Loan Originator Barrett, Broker Solutions, Inc. and Kind Lending is liable to Ms. Creech for actual and statutory damages and reasonable legal service fees and costs.

**CLAIM TWO: A.R.S. §§ 44-521 to 44-1534.**
**Violations of the Arizona Consumer Fraud Act**
**(Defendants Barrett Financial Group, L.L.C. & John Hegglin)**

*Arizona Consumer Fraud Act. A.R.S. § 44-1522(A)*

66. All prior allegations are incorporated by reference.

67. Ms. Creech hereby sues Defendants Barrett and Hegglin under the Arizona Consumer Fraud Act. The Arizona Consumer Fraud Act (Arizona Trade & Commerce Code, Title 44 Article 7, Section 1521 to 1524) protects consumers against unfair and deceptive conduct.

68. Ms. Creech is a person within the meaning of A.R.S. §§ 44-1521(6) because she is a natural person.

69. Defendant Barrett is business within the meaning of A.R.S. §§ 44-1521(6) because it is a business entity, company, and can be sued under the Arizona Consumer Fraud Act.

70. The loan transaction at issue is merchandise of as defined under A.R.S. §§ 44-1521(5) and progeny of case law.

71. Defendants John Hegglin and Barrett are each persons within the meaning of A.R.S.§§ 44-1521(6).

72. Barrett, through its loan officer Hegglin violated the Arizona Consumer Fraud Act by failing to timely disclose the increased costs of the loan prior to closing, causing Ms. Creech to be charged twice for the architect fee of $672.75, and the $250.00 mobile notary fee.

73. Barrett through its loan officer Hegglin failed in their respective duty of care requirement for mortgage originators as implemented by Regulation Z under 15 U.S.C. 1639(b)(1)(A).

74. Mr. Hegglin's documented and substantiated misrepresentations and willful deceit in connection with the application for the loan are actionable conduct under the Arizona Consumer Fraud Act against him individually and against Barrett under theory of agency and vicarious liability as alleged later in this complaint.

75. Mr. Hegglin's knowledge and apparent business practices as described here typifies willful deceit and shows reckless indifference to Ms. Creech's interests; such conduct is subject to punitive damages. Punitive damages are to be awarded to punish the wrongdoer and deter such misconduct in the future. *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326 (1986).

76. Ms. Creech incurred economic loss by being charged twice for the architect fee of $672.75, extra costs to place parents in hotel $956.35 and rental truck fees $2,085.00 and the $250.00 mobile notary fee she was charged twice due to Hegglin's conduct. Barrett and Hegglin's conduct caused Ms. Creech to lose sleep, loss of appetite, anxiety because of the deterioration of and significant risk to her parents' health and other related fears for them having to stay in motel much longer than they should have.

77. Ms. Creech may recover actual damages including incidental, consequential, as well as attorney fees and legal costs. Arizona courts are more than willing to award damages for mental suffering, humiliation, and emotional harm, if that is the type of harm that is typical of the tort. See e.g., *Gau v. Smitty's Super Valu, Inc.,* 183 Ariz. 107, 110 (Ariz. Ct.

App. 1995) ("Since the injury is in large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like.").

## CLAIM THREE:
### Breach of Contract
### (Defendant Lenders)

78. All prior allegations are incorporated by reference.

79. Ms. Creech sues Defendant Barrett for breach of contract. The elements for breach of contract under Arizona case law are (1) the existence of a contract; (2) breach; and (3) resulting damages. *First American Title Insurance Company v. Johnson Bank*, 239 Ariz. 348, 353 (Ariz. 2016).

80. Ms. Creech entered into a loan agreement that prescribed fees and costs. Defendant Lenders through their loan officer Hegglin breached promise under the agreement by overcharging fees (charging them twice) and changing loan terms that increased costs from those originally agreed upon.

81. The direct result of the breach of the agreement was injury to Ms. Creech in the form of her additional out-of-pocket costs to house her elderly parents in a hotel and extension of time to rent the moving truck.

82. On September 22, 2021, Ms. Creech sent a written settlement offer, with a confirmed delivery date on September 24, 2021 and Lender and Barrett did not respond with any offer of resolution.

83. Ms. Creech incurred economic loss by being charged twice for the architect fee of $672.75, extra costs to place parents in hotel $956.35 and rental truck fees $2,085.00 and the $250.00 mobile notary fee she was charged twice due to Hegglin's conduct. Barrett and

Hegglin's conduct caused Ms. Creech to lose sleep, loss of appetite, anxiety because of the deterioration of her parents' health and other related fears for them having to stay in motel much longer than they should have.

84. Ms. Creech is entitled to recover her loss including reasonable legal services fees and costs under A.R.S. §12.341.01.

## CLAIM FOUR:

### A.R.S. § 47-1304.Violation of Good Faith and Fair Dealing

85. All prior allegations are incorporated by reference.

86. Arizona law implies in every contract a covenant of good faith and fair dealing that "prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490, ¶ 59 (Ariz. 2002). "A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying the other party the reasonably expected benefits of the agreement." *Nolan v. Starlight Pines Homeowners Ass'n*, 216 Ariz. 482, 489, ¶ 27, 167 P.3d 1277, 1284 (App. Div. 1,2007).

87. The Good Faith and Fair Dealing statute requires that **neither party act to Impair** the right of the other to receive the benefits that flow from their agreement or contractual relationship.

Here, based on conduct described herein, Mr. Hegglin, as an agent of Barrett, and willfully obstructed Ms. Creech from benefiting from the initially promised loan terms; thereby, violating the contract's implied covenants of good faith and fair dealing as

described herein.

88. Ms. Creech incurred economic loss by being charged twice for the architect fee of $672.75, extra costs to place parents in hotel $956.35, rental truck fees $2,085.00, and the $250.00 mobile notary fee she was charged twice due to Hegglin's conduct. Barrett and Hegglin's conduct caused Ms. Creech to lose sleep, loss of appetite, anxiety because of the deterioration of her parents' health and other related fears for them having to stay in motel much longer than they should have.

89. Ms. Creech seeks an award of actual damages and reimbursement of reasonable legal service fees and costs as remedies.

### V.   AGENCY/VICARIOUS LIABILITY

90. All prior allegations are incorporated by reference.

91. Parties create an agency relationship when a person (principal) manifests assent to another person (agent) that the other agents shall act on principal's the behalf, subject to the principal's control, and the agent manifests assent or otherwise consents so to act on behalf of the principa1. RESTATEMENT (SECOND) OF AGENCY § (1)l (1958).

92. Agency relationships are often established by employment, even where an agent is not an employee but works for the principal under agreement the principal can be found responsible for the agent's act under the theory of ostensible agency.

93. Ostensible agency is one in which the principal has intentionally or inadvertently induced third persons to believe that such a principal, here, Hegglin was Barrett's employee based on representations within the Barrett loan documents.

94. Hegglin also acted on behalf Broker Solutions, Inc. and Kind Lending.

17

95. Ms. Creech relied upon Hegglin's representations on behalf of the lender/loan originator during acts described in this complaint.

96. Ms. Creech incurred harm as described above by relying upon Mr. Hegglin to help her and Hegglin's acts and failures to act harmed Ms. Creech and her elderly parents.

97. As described in this complaint Barrett, Broker Solutions, Inc. and Kind Lending, assented to Hegglin's acts and accepted them as their own, even after informed of Hegglin's acts prior to filing this lawsuit.

98. Barrett, Broker Solutions, Inc. and Kind Lending controlling acts before, during and after the loan transaction, establish intent that Barrett, Broker Solutions, Inc. and Kind Lending intended an agency relationship existed between each principal: Barrett, Broker Solutions, Inc. and Kind Lending, and Hegglin.

## VI.     DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Arizona Rules of Civil Procedure, Plaintiff demands trial by jury of all issues triable.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter Judgment in her favor and against Defendants as follows:

A.     An award of any available statutory and actual damages including any compensatory, incidental, or consequential damages commensurate with proof at trial for the acts complained of herein; and

B.      An award of punitive damages for Defendants' respective course of conduct with a conspicuous disregard of the risk of harm to Plaintiff commensurate with proof at trial for the acts complained of herein; and

C.      For pre- and post-judgment interest on any amounts awarded herein at the maximum lawful rate from the date of its rendition until paid in full; and

D.      For costs, and reasonable legal service fees under the Truth in Lending Act, 15 U.S.C. § 1640(a) (3), and under A.R.S. § 12.341.01; and

E.      All equitable relief and such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED this 20th day of May, 2022.

**A. FERRARIS LAW, P.L.L.C.**

/s/ *Christine Anderson Ferraris*
Christine A. Ferraris
Stephen M. Weeks
*Attorneys for Plaintiff*