Christine Anderson Ferraris, #031414
A. FERRARIS LAW, P.L.L.C.
333 N. Wilmot, Suite 340
Tucson, AZ 85711
Tel.:(520) 282-4201
Email: cferraris@aferrarislaw.com
*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bonnie Creech,<br><br>        Plaintiff,<br><br>v.<br><br>Barrett Financial Group, L.L.C; Broker Solutions, Inc., dba Kind Lending, Kind Lending, L.L.C., John Claude Hegglin, an individual, and as an agent of Barrett Financial Group, L.L.C, and Broker Solutions, Inc. dba Kind Lending and Kind Lending, L.L.C.<br><br>        Defendants. | Case No. **2:22-cv-00871-SMB**<br><br><br><br>**FIRST AMENDED CIVIL COMPLAINT & DEMAND FOR JURY TRIAL**<br><br>**HON.  SUSAN M.  BRNOVICH** |

Plaintiff, Bonnie Creech submits this first amended complaint against Defendants for conduct that caused Ms. Creech and her parents to incur harm by their unfair and deceptive lending practices subjecting Defendants to state and federal legal claims as described in the following complaint.

## I.    PARTIES, JURISDICTION AND VENUE

1.    Plaintiff, Bonnie Creech ("Ms. Creech" or "Plaintiff"), resides in Bluemont, Virginia and entered into a loan to purchase a manufactured home in Kingman, Arizona as a residence she purchased for her elderly parents.

1

2.      Barrett Financial Group, L.L.C. ("Barrett" or "Defendant"), is identified as the lender in loan status and pre-qualification documents provided to Ms. Creech in March and April 2021. Barrett operates its principal place of business from Gilbert, Arizona in Maricopa County. Barrett is a registered Arizona limited liability company. In a Revised Loan Estimate dated May 13, 2022, and a closing disclosure dated May 19, 2021, Barrett is also identified as the mortgage broker. In the Promissory note, Barrett is identified as the loan originator organization.

3.      Defendant John Claude Hegglin ("Hegglin") represented within loan documents that he acted as loan officer for Barrett. Hegglin is identified as Barrett's loan officer in loan status documents provided to Ms. Creech in March and April 2021. The email address he used during the loan transaction as the loan officer was john@barrettfinancial.com, and his email signature consists of the following: NMLS: 1054250 Arizona: 0927835, Michigan:1054250, Utah 120405991. Mortgage Loan Originator, 2314 South Val Vista Dr #201 Gilbert AZ. 85295 Office :480-459-4500 Mobile :480-535-4620 Fax:480-718-8999. Hegglin also represented during the loan transaction he acted for Broker Solutions, Inc. dba Kind Lending. Hegglin is listed on the Promissory note as an individual loan originator.

4.      Broker Solutions, Inc. dba Kind Lending, is a California corporation, registered in Arizona as a foreign corporation since 2005. Its Affidavit of Publication dated August 18, 2005, states that it adopted the fictitious name New American Funding, Inc. (FN) when registering its business in Arizona. Broker Solutions, Inc.'s annual reports filed with the Arizona Corporation Commission ("the ACC") for 2021 and 2022 represent its

character of business is mortgage lending, with a Phoenix address of 8825 N. 23rd Ave., Suite 100, Phoenix, Arizona, 85021. According to the 2022 Annual Report filed with the ACC, Treasurer/Director is Enrico Arvielo with an address in Las Vegas, Nevada and President is Patricia Arvielo, Nevada with an address in  Las Vegas, Nevada. Broker Solutions Inc.'s Corporate Disclosure Statement (Doc. 21) represents it does not have any parent corporations and no publicly held corporation owns 10% or more of Broker Solutions.

5.     A changed Circumstance Letter and Loan Estimate dated May 13, 2021, identifies Broker Solutions, Inc., dba Kind Lending as the lender/creditor, as does the Closing Disclosure dated May 19, 2021. An email to Ms. Creech from Kind Lending has both records attached and directed questions about loan documents to be addressed to John Hegglin and Barrett Financial Group, L.L.C.

6.     Broker Solutions, Inc. dba Kind Lending is listed as the creditor on the Promissory note.

7.     Kind Lending, LLC is a Kentucky limited liability company, its manager according to Arizona Corp. Commission records is Kind Holdings, LLC. Kind Lending, LLC adopted the fictitious name: Kind Loans (FN) when registering that entity with the Arizona Corporation Commission. The Articles of Organization filed with the Arizona Corporation Commission on January 28, 2021 indicate that Kind Lending, LLC is in the mortgage lending services business.  Its principal office according to Statement of Change of Principal Office Address, filed Feb. 2, 2021, is Hutton Centre Dr., Suite 1000, Santa Ana, CA 92707. Kind Lending, LLC's Corporate Disclosure Statement (Doc. 22)represents

it is the parent company to Kind Lending and no publicly held corporation owns 10% or more of Kind Lending.

8.      The appraisal report for the manufactured home Ms. Creech purchased identified "Kind Lending" as the lender/creditor for the loan transaction at issue.

9.      Together, Barrett and Broker Solutions, Inc. dba Kind Lending, are referenced hereinafter by their name or together as the lender/loan originator with Hegglin acting as their respective agent, and as an originator.

10.     Defendants named created agency relationships by each acting on behalf of each other in roles of principal and agent.

11.     Agency relationships are created even where an agent works for the principal under agreement, under such circumstance the principal can be found responsible for the agent's conduct under the theory of ostensible agency. Ostensible agency is one in which the principal has intentionally or inadvertently induced third persons to believe and accept that the agent's conduct represents the position of the principal.

12.     Here, Hegglin was Barret's employee based on representations within the loan documents and elsewhere.

13.     Hegglin as represented in loan documents and elsewhere also acted on behalf Broker Solutions, Inc. dba Kind Lending.

14.     Ms. Creech relied upon Hegglin's written and verbal representations on behalf of the co-defendants during acts described in this complaint.

15.     As described in this complaint Barret and Broker Solutions, Inc. dba Kind Lending, assented to Hegglin's acts and accepted them as their own, even after being

4

informed of Hegglin's acts prior to the filing of this lawsuit.

16.     Barret, Broker Solutions, Inc. dba Kind Lending's controlling acts before, during and after the loan transaction, establish intent that Barrett, Broker Solutions, Inc. dba Kind Lending intended an agency relationship existed between each principal: Barret, Broker Solutions, Inc. dba Kind Lending, and Hegglin.

17.     Venue is proper in this Court pursuant to A.R.S.§§ 12-401 to 12-401 in that Defendants conduct regular business within Maricopa County and most of the events, actions related to the manufactured home purchase, its loan and origination occurred in or from Maricopa County.

## II.     GENERAL ALLEGATIONS

18.     In or around January 2021, Ms. Creech applied for a loan with Barrett loan officer Mr. Hegglin to purchase a manufactured home for her elderly parents.

19.     Barrett accepted her loan application and thereby accepted an originator/ broker's fiduciary duty to a borrower to act on ~~her~~ Ms. Creech's behalf and ~~in~~ serve her best interest; to keep her timely informed of all matters material to the transaction;. which included, but was not limited to, informing and advising her of any requirement to qualify for  a mortgage chosen for her, and to apprise her of changes or discoveries that could be problematic, along with the duty not to misrepresent or conceal any facts relevant to the terms of the loan.

20.     After Ms. Creech submitted a loan application to Barrett, she received a loan pre-qualification agreement on March 23, 2021 which was signed by Barrett as the Lender, Mr. Hegglin as Loan Officer; and by Ms. Creech as borrower providing that Ms. Creech

qualified for a loan of $148,437 with interest over 30 years at 3.375% in connection with her desire to purchase a manufactured home for her parents.

21.     On the same date, Ms. Creech received from Broker Solutions, Inc. dba Kind Lending, an Initial Disclosure "in conjunction with your loan application with Barrett."

22.     Ms. Creech told Mr. Hegglin that she was unfamiliar with the purchase and lending requirements for manufactured homes.

23.     Living in Virginia, Ms. Creech relied on Mr. Hegglin to help her obtain a loan to purchase an Arizona property and a manufactured home because her parents needed a place to live and would soon be without a home. In or around March 2021, Ms. Creech flew to Arizona from Virginia to view a manufactured home in Kingman, Arizona (the "Kingman home") to ensure it fit the needs of her elderly parents, who have significant health and mobility issues.

24.     Shortly thereafter, Ms. Creech made an offer on the Kingman home and the offer was promptly accepted. Thereafter, Ms. Creech cancelled the transaction and turned her attention to another Manufactured Home in Kingman, Arizona which she ultimately purchased for her parents in late May, 2021.

25.     Ms. Creech requested and was told by Mr. Hegglin that an appraisal of the home would be scheduled promptly because she had already been pre-approved for the loan.

26.     Ms. Creech did not receive the appraisal until May 10th, though the Appraisal Report is dated April 16, 2021. According to email records "Kind Lending" provided the appraisal report on or about May 10, 2021.

27.     The sellers of the manufactured home had informed Ms. Creech they could not wait any longer for her to purchase the Kingman home in late April and early May.

28.     Ms. Creech lost sleep, and suffered stress and anxiety while waiting for the delayed appraisal report and feared she would lose the opportunity to purchase the Kingman home for her elderly parents.

29.     Mr. Hegglin reassured Ms. Creech that he was doing all that he could to promptly complete the loan process.

30.     On May 11, 2021, upon receipt of the appraisal, Ms. Creech and the sellers agreed to a decrease in the purchase price, given the decreased valuation of the appraisal report.

31.     On May 13, 2021, Mr. Hegglin provided Ms. Creech with a Changed Circumstances Letter and revised Loan Estimate Statement defining a "change in circumstances" as a change in "sales price", "value" or "loan amount" and a mandated rate lock extension.

32.     The amended Loan Estimate Statement had a loan amount of $142,500, and an origination charge of .61 percent of the loan amount, which amounted to $869.

33.     On May 14, 2021, Mr. Hegglin sent Ms. Creech the Closing Disclosure Statement with an increased origination charge of .77 percent of the loan amount, or $1,097.25, increasing the origination charge by $288.25.

34.   Also included in the Closing Disclosure Statement was a charge for $672.75 for an Architectural and Engineering Fee that Ms. Creech had already paid to AZ Sunwest Construction on May 11, 2021.

35.   Ms. Creech informed Mr. Hegglin that she had already paid the Architectural and Engineering Fee and that she had emailed him a copy of the receipt on May 12, 2021. She offered to provide it to him again, for the second time, the receipt for the Architectural and Engineering Fee in the amount of $672.75.

36.   Mr. Hegglin assured Ms. Creech that the fee would be removed from the final Closing Statement.

37.   On May 20, 2021, the initial closing date, Ms. Creech was provided with the revised final Closing Disclosure Statement.

38.   This record showed another increased monthly mortgage insurance fee of $81.94 (a monthly increase of $19 from the Closing Disclosure Statement dated May 14th) and an increased origination fee of 1.27% of the loan amount, which amounted to $1,809.75.

39.   This increase of the total origination fee was $712.50 more than the first Closing Disclosure Statement dated May 14th.

40.   The $672.75 Architectural and Engineering Fee remained on the closing statement.

41.   A comparison between the May 13, 2021 Loan Estimate from Broker's Solution dba Kind Lending and the May 20, 2021 "Closing Disclosure" from Chicago Title is set forth below and shows that the loan amount remains at $142,500.00, the interest rate

remains at 3.375%, the monthly payment of principal and interest payment remain the same at $629.99, the mortgage insurance increased from $63.00 per month to $81.94 per month, the escrow fees decreased from $128.00 to $118.65, the gross monthly payment went up from $821,00 to $830.58, the estimated taxes and closing costs were decreased from $128.00 to $118.65, the estimated closing costs increased from $6,766.00 to $6,870.55 and the cash to close went from $14, 742.00 to $11,825.55. Finally, and most significantly, despite the fact that the amount of the loan did not change, the loan origination fee doubled from .61% or $869.00 to 1.27 % or $1809.75 paid to Broker Solutions, Inc. dba Kind Lending to Barrett.

42.     As alleged in Count I, the increase in the origination fee in the absence of an increase in the loan amount constituted a violation of 15 U.S.C. Section 1609(c)(1) which states that "For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal.")

43.     On May 20th, Ms. Creech called Mr. Hegglin during closing to ask why the fees had increased without notice and why she continued to be charged for the Engineering Fee that had already been paid, and why she had not been notified of the increased charges before closing.

44.     Mr. Hegglin dismissed Ms. Creech's concerns and advised her to move forward with signing the closing documents, promising her again that the $672.75 charge

for Architectural and Engineering Fees would be refunded. It was never refunded and remains part of the loan.

45.     During the call Mr. Hegglin disclosed for the first time (after he had already sent the May 14th Disclosure Statement), that the appraiser informed him a Manufactured Home ("MH") Advantage sticker was not found during the appraisal inspection, so Mr. Hegglin switched Ms. Creech to a different loan product, resulting in the higher fees and an Annual Percentage Rate increase from 3.763% to 3.916%. Ms. Creech relied on this representation being true and moved forward with the loan process.

46.     Prior to May 20, 2021, Mr. Hegglin never informed Ms. Creech that the home required an MH Advantage sticker and, without it she was ineligible for the loan terms she relied upon and she had qualified for under the loan estimate provided.

47.     Though she requested, Ms. Creech was never informed how the MH Advantage sticker purportedly triggered a mandated change in the loan product.

48.     The revised Closing Disclosure Statement dated May 25, 2021 shows that Kind Lending, Barrett and Mr. Hegglin again failed to provide an accurate closing statement in that it still included the $672.75 charge for the Architectural and Engineering Fee and the last minute increase in the origination fee, and an increase in the mortgage insurance, thought Barrett and Hegglin were informed by Ms. Creech they should not be on the closing statement and they acknowledged the overcharges.

49.     Mr. Hegglin was never clear as to his role in the loan process.

50.     Mr. Hegglin owed a duty to Ms. Creech to be forthcoming and disclose information about the loan such as the change in loan product and increased costs.

51.     By the time Ms. Creech was informed about the alleged missing MH sticker and the alleged required change in loan terms, Ms. Creech decided it was in her and her parents' best interest to affirm and close on the transaction by signing the Promissory Note and Deed of Trust in favor of the creditor Brokers Solutions dba Kind Lending and to thereafter seek remedy for the harm caused by defendants' misconduct..

52.     Ms. Creech relied upon Mr. Hegglin's May 20, 2021 representations as to the changes in the transaction and ultimately believed she had no choice but to sign the closing documents with each closing rather than cancel the sale and start over.

53.     Ms. Creech had relied upon Mr. Hegglin's representations and as a result had the pressure of a seller deadline to close the transaction with unexpected and higher costs and had to pay again fees she had paid for, and accept more onerous payment terms than Mr. Hegglin had represented to Ms. Creech prior to closing.

54.     On or about May 24, 2021, Ms. Creech asked Mr. Hegglin about the Truth in Lending Act's restrictions on increases in loan fees and inquired if she should have received notice of the change in loan terms prior to the closing.

55.     Mr. Hegglin responded he had met all legal obligations and had provided proper disclosures.

56.     Though Ms. Creech had signed the closing documents on May 20, 2021, by May 25, 2021, the loan remained unfunded.

57.     Ms. Creech was sleeping poorly and suffered stress, anxiety, and loss of appetite, given that the loan was not timely funded and her parents had to move to a hotel while waiting for the sale to conclude.  Her parents, who suffer from a variety of health

conditions, including high blood pressure, limited mobility, and chronic obstructive pulmonary disease, also experienced sleeplessness, poor appetite, stress, and anxiety, and were extremely fearful of staying in a hotel and contracting COVID-19, given their preexisting health conditions and high-risk status.  Ms. Creech's parents also suffered food poisoning while staying in the hotel due to the delayed loan closing.

58.     Ms. Creech informed Mr. Hegglin about her anxiety because her parents were homeless and she relied upon his promises that the loan process would be promptly completed.  She explained to him concerns of her parent's wellbeing and that her parents were without a home and waiting for the purchase of the Kingman manufactured home to close.

59.     On May 25, 2021, Mr. Hegglin, for the first time, claimed that a three-day waiting period was required due to the APR increase on the May 20, 2021, Disclosure Statement.

60.     Mr. Hegglin without notice or communicating beforehand with Ms. Creech, unilaterally canceled the May 20, 2021, closing where all documents had been signed and Ms. Creech understood was finalized without notice, and re-scheduled the closing date to May 26th.

61.     Mr. Hegglin did so after being informed by Ms. Creech of her rights to be informed of changes to loan products and increased fees and his failures to meet federal law obligations.

62.     Because of the cancellation Ms. Creech was forced to pay more to extend her elderly parents' hotel stay ($956.35) and to extend their moving truck rental period

($2,085).

63.     Ms. Creech asked Mr. Hegglin to honor the original terms represented in the May 14, 2021, Closing Disclosure Statement to help pay for these increased and unanticipated expenses.

64.     Mr. Hegglin promised to provide credit to offset the loss but, in the end, again reneged on his promise to reimburse her for the extra fees and overcharges incurred.

65.     Instead, on May 26, 2021, Ms. Creech was presented with a third Closing Disclosure Statement. The credit Mr. Hegglin promised was limited to $450, a minimal amount given the economic loss, aggravation, and stress that Mr. Hegglin's conduct had caused Ms. Creech and her parents.

66.     By this time, Ms. Creech and her parents were under significant additional stress because the sellers threatened to cancel the sale due to delays. This stress, combined with Mr. Hegglin's revoked offer to fully credit the total loss incurred or honor the initial loan terms, caused Ms. Creech and her parents significant worry and anxiety. With each day of delay, Ms. Creech was paying $150 to shelter her parents in a motel and her high-risk parents were under significant risk of contracting COVID-19.

67.     Ms. Creech sought an alternative and wanted to cancel the transaction but decided she shouldn't for it would take, at minimum; another 60 days to seek financing elsewhere, to restart the loan process with another lender, and complete the purchase.

68.     Ms. Creech realized that if she had cancelled she would likely have had to find a new house suitable for her elderly parents and would likely have struggled to do so, given the very competitive real estate market.

69.     In the face of these mounting pressures of costs, delays, and stress, Ms. Creech signed the closing documents on May 26th.

70.     In early June 2021, Ms. Creech received a Final Master Statement from Chicago Title Agency, Inc. detailing the final closing accounting calculations.

71.     The Engineering Fee, contrary to Mr. Hegglin's promise, was not refunded, and Ms. Creech was charged a second $250 mobile notary fee for the rescheduled closing though Mr. Hegglin promised it would not be charged.

## III.   LEGAL CLAIMS

### CLAIM ONE: VIOLATION OF THE TRUTH IN LENDING ACT: FAILURE TO TIMELY DISCLOSE LOAN TERMS
### (Defendants Lender/Originator: Barrett, and Broker Solutions, Inc. dba Kind Lending)

72.     All prior allegations are incorporated by reference.

73.     Lender/Creditor Broker Solutions, Inc. dba Kind Lending through its loan officer Hegglin and agent Barrett violated the Truth in Lending Act Regulation Z by failing to timely disclose the increased costs of the loan ultimately funded to Ms. Creech   prior to closing.

74.     Lender/Creditor Broker Solutions dba Kind Lending through its loan officer Hegglin and agent Barrett failed to timely disclose to Ms. Creech that they wrongfully believed without inspection, due diligence or any reference in the appraisal of the subject loan, that the loan product they claim they initially intended for her purchase of a manufactured home would have affixed to it a MH Advantage Sticker.

75.     Such a sticker is usually affixed to Manufactured Homes with attributes such

as attached garages and porches with roofs and stairs made to cause them to more closely resemble stick- built homes and thus to allow appraisers to utilize stick built comparables to increase the value of the home and the amount the lender can loan to a borrower. This concealment disclosed at the scheduled closing was deceitful and willful.

76.     Lender/Creditor Broker Solutions dba Kind Lending's doubling of the origination fee in the absence of an increase in the loan amount constituted a violation of 15 U.S.C. Section 1609(c)(1) which states that "For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal.")

**Originators Barrett and Hegglin**

77.     Originator Barrett's acceptance of an origination fee double the amount set forth in the prior Disclosure Closing Statement  in the absence of an increase in the loan amount constituted a violation of 15 U.S.C. Section 1609(c)(1) which states that " For any residential mortgage loan, no mortgage originator shall receive from any person and no person shall pay to a mortgage originator, directly or indirectly, compensation that varies based on the terms of the loan (other than the amount of the principal.")

78.     Originator/Loan Officer Hegglin failed in his respective duty of care requirement for mortgage originators as implemented by Regulation Z under 15 U.S.C. 1639(b)(1)(A) and by his concealment of his failure to ascertain the presence or absence of a MH Advantage Sticker  on the Beverly Manufactured Home which omission caused delay and consequential damages.

79.     Further under, 12 C.F.R. § 1026.17(f), which mandates early disclosures shall be provided before consummation of the loan (subject to the provisions of §1026.19(a)(2), (e), and (f)):

**(1)** Any changed term unless the term was based on an estimate in accordance with §1026.17(c)(2) and was labeled an estimate;

**(2)** All changed terms, if the annual percentage rate at the time of consummation varies from the annual percentage rate disclosed earlier by more than $1/8$ of 1 percentage point in a regular transaction, or more than $1/4$ of 1 percentage point in an irregular transaction, as defined in §1026.22(a).

80.     See *DeMando v. Morris* 206 F.3d 1300, 1303 (9th Cir. 2000)(De Mando pursued claim when the Notice of Change in Terms violated TILA). Notably, TILA is a **strict liability statute**. *Balderas v. Countrywide Bank*, 664 F.3d 787, 791 (9th Cir. 2011) (reiterating an earlier decision that even a technical or minor TILA violations impose liability, such as a misstatement of rescission deadline by one day will extend a consumer's right to rescission period). *See also Abubo v. Bank of N.Y. Mellon*, 977 F. Supp. 2d 1037, 1044 (D. Haw. 2013) (To ensure a consumer is protected TILA and accompanying regulations "must be absolutely complied with and strictly enforced)."

81.     Ms. Creech incurred economic loss by being charged and increase in APR and mortgage insurance; twice for the architect fee of $672.75; plus, additional expenses to place her parents in a hotel paying $956.35; and rental truck fees $2,085.00, then charged twice for $250.00 mobile notary due to Mr. Hegglin's cancellation of the first scheduled closing.

82.     Barrett and Hegglin's conduct caused Ms. Creech to lose sleep, her appetite,

and caused anxiety and worry because of the deterioration of her parents' health and other related concerns for them having to stay in a motel much longer than they should have.

83.     Based on Loan Originator Barrett and Lender/Broker Solutions, Inc. dba Kind Lending's conduct during the loan application process, each of Lender/Loan Originator Barrett, Lender/Creditor Broker Solutions, Inc. dba Kind Lending are jointly and severally liable to Ms. Creech for actual and statutory damages and reasonable legal service fees and costs.

### CLAIM TWO: A.R.S. §§ 44-1521 to 44-1534.
### Violations of the Arizona Consumer Fraud Act
### (Defendants Barrett Financial Group, L.L.C. & John Hegglin)

*Arizona Consumer Fraud Act. A.R.S. § 44-1522(A)*

84.     All prior allegations are incorporated by reference.

85.     Ms. Creech hereby sues Defendants Barrett and Hegglin under the Arizona Consumer Fraud Act. The Arizona Consumer Fraud Act (Arizona Trade & Commerce Code, Title 44 Article 7, Section 1521 to 1524) protects consumers against unfair and deceptive conduct.

86.     Ms. Creech is a person within the meaning of A.R.S. §§ 44-1521(6) because she is a natural person.

87.     Defendant Barrett is a business within the meaning of A.R.S. §§ 44-1521(6) because it is a business entity, company, and can be sued under the Arizona Consumer Fraud Act.

88.     The loan transaction at issue is merchandise of as defined under A.R.S. §§ 44-1521(5) and progeny of case law.

89.    Defendants John Hegglin and Barrett are each persons within the meaning of A.R.S.§§ 44-1521(6).

90.    Barrett, through its loan officer Hegglin violated the Arizona Consumer Fraud Act by failing to timely disclose the increased costs of the loan prior to closing, causing Ms. Creech to be charged twice for the architect fee of $672.75, and the $250.00 mobile notary fee.

91.    Barrett through its loan officer Hegglin failed in their respective duty of care requirement for mortgage originators as implemented by Regulation Z under 15 U.S.C. 1639(b)(1)(A).

92.    Mr. Hegglin's documented and substantiated concealment as to his failure to ascertain whether a MH Advantage Sticker was affixed to the Beverly home which he claims was essential to use of the loan product chosen for Ms. Creech  and willful deceit in connection with the application for the loan while acting on behalf of himself, Barrett, and the Creditor, are actionable conduct under the Arizona Consumer Fraud Act against him individually and against Barrett and the Lender by virtue of their agency relationship.

93.    Mr. Hegglin's knowledge and apparent business practices of concealment and false promises of payment of such items as the Architectural fees Ms. Creech was promised would be removed from the final Closing Statement as described herein typifies willful deceit and shows reckless indifference to Ms. Creech's interests; such conduct is subject to punitive damages. Punitive damages are to be awarded to punish the wrongdoer and deter such misconduct in the future. *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326 (1986).

94.     Ms. Creech incurred economic loss by being charged twice for the architect fee of $672.75, extra costs to place her parents in a hotel $956.35 and rental truck fees $2,085.00 and the $250.00 mobile notary fee she was charged twice due to Mr. Hegglin's conduct. Barrett and Hegglin's conduct caused Ms. Creech to lose sleep, loss of appetite, anxiety because of the deterioration of and significant risk to her parents' health and other related fears for them having to stay in motel much longer than they should have.

95.     Ms. Creech may recover actual damages including incidental, consequential, as well as attorney fees and legal costs. Arizona courts are more than willing to award damages for mental suffering, humiliation, and emotional harm, if that is the type of harm that is typical of the tort. See e.g., *Gau v. Smitty's Super Valu, Inc.,* 183 Ariz. 107, 110 (Ariz. Ct. App. 1995) ("Since the injury is in large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like.").

**CLAIM THREE:**
**Breach of Contract**
**(Defendant Broker Solution as Lender/Creditor)**

96.     All prior allegations are incorporated by reference.

97.     The elements for breach of contract under Arizona case law are (1) the existence of a contract; (2) breach; and (3) resulting damages. *First American Title Insurance Company v. Johnson Bank*, 239 Ariz. 348, 353 (Ariz. 2016).

98.     By accepting Ms. Creech's loan application and approving it in writing and providing her with a signed Pre- Qualification Agreement to loan her $148,437.00 at 3.375% and thereafter approving her loan in the amount of $142,500.00  and providing her with several Loan Disclosures in connection with attempting and ultimately closing that

loan transaction to acquire the Beverly Manufactured Home for her parents, the parties reached an agreement which required that they each take all reasonable actions necessary to allow the other to reach their reasonable expectations concerning the outcome of the transaction.

99.    Broker Solutions dba Kind Lending breached the parties agreement by paying an inflated origination fee at closing to Barrett in violation of TILA and by virtue of its agent's Hegglin's deceit, concealment and misrepresentations which extended the time in which the transaction remained unfinished at significant cost to the borrower.

100.    The direct result of the breach of the agreement was injury to Ms. Creech in the form of her additional out-of-pocket costs to house her elderly parents in a hotel and extension of time to rent the moving truck and the additional consequential and incidental damages described in paragraph 54, 77, 98 and elsewhere.

101.    On September 22, 2021, Ms. Creech sent a written settlement offer, with a confirmed delivery date on September 24, 2021 and Lender and Barrett did not respond with any offer of resolution.

102.    Ms. Creech incurred economic loss by being charged twice for the architect fee of $672.75, extra costs to place her parents in a hotel of $956.35 and rental truck fees of $2,085.00 and the $250.00 mobile notary fee she was charged twice due to Hegglin's and Barrett's conduct. Barrett and Hegglin's conduct caused Ms. Creech to lose sleep, loss of appetite, anxiety because of the deterioration of her parents' health and other related fears for them having to stay in a hotel much longer than they should have.

103.    Ms. Creech is entitled to recover her loss including reasonable legal services fees and costs under A.R.S. §12.341.01.

### CLAIM FOUR:

### A.R.S. § 47-1304. Violation of Good Faith and Fair Dealing

104.    All prior allegations are incorporated by reference.

105.    Arizona law implies in every contract a covenant of good faith and fair dealing that "prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 490, ¶ 59 (Ariz. 2002). "A party may breach the implied covenant even in the absence of a breach of an express provision of the contract by denying the other party the reasonably expected benefits of the agreement." *Nolan v. Starlight Pines Homeowners Ass'n*, 216 Ariz. 482, 489, ¶ 27, 167 P.3d 1277, 1284 (App. Div. 1,2007).

106.    The Good Faith and Fair Dealing statute requires that neither party act to or impair the right of the other to receive the benefits that flow from their agreement or contractual relationship.

107.    Here, based on conduct described herein, Mr. Hegglin, as an agent of Barrett and the Kind Lending, willfully obstructed Ms. Creech from benefiting from the initially promised loan terms by concealing his failure to ascertain whether the Beverly Manufactured Home had the MH Advantage Sticker which was required to enable the initial loan product to be utilized by Ms. Creech; thereby, violating the contract's implied covenants of good faith and fair dealing as described herein.

108.   Here, based on conduct described herein, Mr. Hegglin, as an agent of Barrett and Kind Lending, willfully obstructed Ms. Creech from benefiting from the initially promised loan terms by concealing his failure to ascertain whether the Beverly Manufactured Home had the MH Advantage Sticker which was required to enable the initial loan product to be utilized by Ms. Creech thereby displaying the evil hand and evil mind which make this matter more than just a breach of contract and thereby, violating the contract's implied covenants of good faith and fair dealing as described herein.

109.   Ms. Creech incurred economic loss by being charged twice for the architect fee of $672.75, extra costs to place her parents in a hotel $956.35 and rental truck fees of $2,085.00 and the $250.00 mobile notary fee she was charged twice due to Hegglin's conduct on behalf of himself, Barrett and Broker Solutions dba Kind Lending. Barrett and Hegglin's conduct caused Ms. Creech to lose sleep, loss of appetite, anxiety because of the deterioration of her parents' health and other related fears for them having to stay in a hotel much longer than they should have.

110.   Ms. Creech seeks an award of actual damages, punitive damages and reimbursement of reasonable legal service fees and costs as remedies.

### V.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Arizona Rules of Civil Procedure, Plaintiff demands trial by jury of all issues triable.

### VI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter Judgment in her favor and against Defendants as follows:

22

A.    An award of any available statutory and actual damages including any compensatory, incidental, or consequential damages commensurate with proof at trial for the acts complained of herein; and

B.    An award of punitive damages for Defendants' respective course of conduct with a conspicuous disregard of the risk of harm to Plaintiff commensurate with proof at trial for the acts complained of herein; and

C.    For pre-and post-judgment interest on any amounts awarded herein at the maximum lawful rate from the date of its rendition until paid in full; and

D.    For costs, and reasonable legal service fees under the Truth in Lending Act, 15 U.S.C. § 1640(a) (3), and under A.R.S. § 12.341.01; and

F.    All equitable relief and such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED this 30th day of January, 2023.

**A. FERRARIS LAW, P.L.L.C.**

*/s/ Christine Anderson Ferraris*
Christine A. Ferraris
*Attorney for Plaintiff*

23

ORIGINAL of the foregoing electronically filed via ECF this 30th day of January, 2023;
COPIES of the foregoing served via ECF to:

Roger A. Wright
WRIGHT LAW FIRM, PLC
3532 E. Cotton Court
Gilbert, Arizona 85234
office@wrightlawaz.com
*Attorney for Defendant*
*Barrett Financial Group, L.L.C.*

David Funkhouser
Anelisa Benavides
SPENCER FANE LLP
2425 East Camelback Road, Suite 850
Phoenix, AZ 85016-4251
dfunkhouser@spencerfane.com
*Attorneys for Defendants Broker Solutions,*
*Inc., dba Kind Lending and Kind Lending,*
*L.L.C*

Robert J. Moon
Moon Law Firm, PLC
1423 S. Higley Road, Suite 112
Mesa, Arizona 85206
robert@moonlawaz.com
*Attorney for Defendant John Claude Hegglin*